UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JILL McNEARNEY,

                            Plaintiff,

      v.

WASHINGTON DEPARTMENT OF
CORRECTIONS and DR. STEVEN
HAMMOND,

                       Defendants.

No. C11-5930 RBL/KLS

**REPORT AND RECOMMENDATION
NOTED FOR: July 2, 2012**

        Plaintiff Jill McNearney, an inmate at the Washington Corrections Center for Women

(WCCW), asks this Court to grant her a preliminary injunction pursuant to Fed. R. Civ. P. 65.

Ms. McNearney requests that the Washington Department of Corrections (DOC) and DOC Chief

Medical Officer Steven Hammond, M.D. be required to follow the recommendation of DOC's

contract orthopedist, Dr. Mark Friedman, who recommended that she be examined by specialists

at the Harborview Medical Center. ECF No. 10. Ms. McNearney requests that Defendants

arrange for the examination and authorize and provide whatever treatment is recommended by

the Harborview specialists. *Id.*; 10-1, at 3.

        Plaintiff filed and noted her motion for consideration for May 4, 2012, four Fridays after

electronically filing her motion on Thursday, April 12, 2012 shortly before midnight. ECF Nos.

10 and 19 (Declaration of Hank Balson) Defendants objected to the noting date and requested

that the Court re-note the motion pursuant to LCR 7(d)(3) because they did not receive electronic

notice that the motion had been filed until *two minutes* after midnight. Defendants filed their

REPORT AND RECOMMENDATION- 1

response to Plaintiff's motion on April 30, 2012. Apparently, they have suffered no prejudice from the two minute delay. The Court will take no action on the request to re-note the motion.

Having carefully reviewed the motion, Defendants' Response (ECF No. 20), Plaintiff's Reply (ECF No. 21), supporting declarations, and balance of the record, the Court recommends that Ms. McNearney's motion (ECF No. 10) be granted.

## MOTIONS TO STRIKE

Plaintiff moves to strike the Declarations of Drs. G. Steven Hammond and Mary L. Colter because they are not signed. ECF No. 21, at 2. This deficiency was cured on May 7, 2012, when Defendants filed signed Declarations of Drs. Hammond and Colter. *See* ECF No. 24. Therefore, this motion to strike is denied.

Plaintiff also moves to strike the following statement found within Dr. Colter's declaration:

> Moreover, Ms. McNearney has been observed walking with ease and apparent comfort, albeit with her unusual gait, over the past few months.

ECF No. 24-1 (Declaration of Mary L. Colter, M.D.), ¶ 34

Plaintiff argues that this statement lacks foundation, is not based on personal knowledge and is based on hearsay. ECF No. 21, at 2. There is no supporting medical examination or other evidence that accompanies this statement and it is clearly based on hearsay. Accordingly, the Court grants Plaintiff's motion to strike this statement and the Court will not consider it as evidence.

Defendants move to strike all medical documents attached to the declaration of Hank Balson, counsel for Plaintiff, pursuant to Fed. R. Evid. 901 and 902. ECF No. 20, at 9. Defendants argue that Mr. Balson did not create these documents, is not their custodian, and he cannot show that he has personal knowledge of their contents. ECF No. 20, at 9. Mr. Balson

responds that the medical records attached to his declaration (ECF No. 13) (with the exception of a report obtained from the Wenatchee Valley Medical Center (Exh. 2 thereto)), were produced to him by Defendants. ECF No. 21, at 4 n.1.

Authentication is a "condition precedent to admissibility," and this condition is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). "A document can be authenticated under Federal Rule of Evidence 901(b)(1) by a witness who wrote it, signed it, used it, or saw others do so." Wright & Gold, *Federal Practice & Procedure: Evidence* § 7106, 43 (2000).

Mr. Balson cannot authenticate the medical records because he lacks personal knowledge of their contents. At best, his declaration affirms that the medical records attached to his declaration are true and correct copies of what counsel for Defendants gave to him. Therefore, the medical records attached to his declaration may not be considered in support of Ms. McNearney's motion for summary judgment. However, the medical records attached to the Declaration of Dr. Colter and Ms. McNearney's Declarations provide ample evidence of Ms. McNearney's medical history, condition, treatment, and recommended treatment.

## STATEMENT OF FACTS

### A. Background of Injury and Treatment Prior to Incarceration

Ms. McNearney was seriously injured in a car accident in 1986 when she was hit head-on by a drunk driver. She suffered a head injury, massive internal injuries, and numerous bone fractures. She states that she was in the hospital for "approximately four to six months" and underwent multiple surgeries over the course of several years to repair much of the damage although several of her injuries still cause her problems. ECF No. 11 (Declaration of Jill McNearney), ¶ 4.

REPORT AND RECOMMENDATION- 3

Before she was incarcerated in October 2010, Ms. McNearney was consulting with doctors in Wenatchee to determine the type of treatment she should pursue to address ongoing pain in her lower right leg, which was worsening. In addition to the pain she was experiencing, she was finding it increasingly difficult to walk and she was falling. She saw several doctors, including orthopedic specialists. All of them indicated that one or more surgeries would likely be necessary but none had come up with a definitive treatment plan. ECF No. 11 (McNearney Decl.), ¶ 5. Instead, it was recommended that she consult with specialists at the Harborview Medical Center in Seattle. However, she was incarcerated before she could arrange for the Harborview consultation and before a final treatment plan could be developed and implemented. *Id.*

On May 28, 2010, Ms. McNearney was examined by Dr. Roger J. Starkweather, a board certified orthopedic surgeon. He determined that her "right ankle joint was deteriorating and she was suffering a loss in functioning of her posterior tibial tendon, as well as a collapse of the arch of her foot and impingement of the calcaneus and fibula bones." ECF No. 14 (Declaration of Roger J. Starkweather), ¶ 7. He states that at the time of his examination, it was evident that Ms. McNearney was suffering from a painful, degenerative orthopedic condition that would not resolve without medical treatment. *Id.* Dr. Starkweather also states that "Ms. McNearney's condition is degenerative. The longer she is denied treatment, the more likely it is that later treatment will need to be more extensive and more expensive." *Id.*, p. 3.

**B.     Treatment at WCCW and Complaints of Pain**

Between October 2010 and May 2011, Ms. McNearney was seen on a number of occasions by the WCCW medical staff for issues relating to her ankle and foot. At various times, she was given Gabapentin, Tegretol, a new cane, and a plastic ankle/foot orthotic (AFO),

REPORT AND RECOMMENDATION- 4

which she returned because it did not fit properly.  ECV No. 24-1 (Colter Decl.), Exh. 2, Attachments C, E, G, and I.   She consistently reported daily pain and limited mobility to WCCW staff.

According to Ms. McNearney, her condition has not improved since she arrived at WCCW in October 2010.  She states that she has been in almost constant pain.  On a good day, she describes her pain as a 6 or 7 on a pain scale of 1 to 10.  On a bad day it is a 10 or higher.  She states that she attempts to manage the pain with Ibuprofen and other non-narcotic pain relievers when they are available to her, but the pain is always present on some level.  When the pain is at its worst, the pain keeps her from sleeping, makes her nauseated, and brings her to tears.  In addition to the pain in her lower right leg, she also has pain in her left knee.  She believes this may be caused because the problems with her right ankle force her to walk unnaturally, which puts extra strain on her left knee.  ECF No. 11 (McNearney Decl.), ¶ 6.

Ms. McNearney states that her condition makes it difficult for her to walk.  She is currently in segregation where her movement is restricted, but when she was living in the general population, it took her a long time to get where she needed to go.  She was often so late to get to the dining hall that she did not have time to finish eating.  She usually stayed in her unit instead of participating in programming activities because it was too painful to walk across campus.  At times she has had to scoot across the floor on her bottom to get to the toilet because it is to excruciating to bear weight standing up.  ECF No. 11 (McNearney Decl.), ¶ 7.   Her condition also causes her to feel depressed and angry because she feels as though there is no relief in sight.  She becomes short-tempered with people, including staff, which does not help her situation.  *Id.*, ¶ 8.

REPORT AND RECOMMENDATION- 5

Medical records attached to Dr. Colter's Declaration (ECF No. 24-1, Exh. 2), reflect that Ms. McNearney has consistently reported daily pain and limited mobility to WCCW staff:

(12/16/10 – Clinic Notes) 25 year history of chronic lower extremity pain. ECF No. 24-2, p. 6.

(12/16/10 – Clinic Notes) "When I asked the patient what she would really like me to do for her she simply stated, ' I want you to take away my pain.'" ECF No. 24-2, p. 6.

(12/29/10 – CRC Report) She reports daily 8-9/10 pain and limited mobility ….Currently she is on high does Ibuprofen and Neurontin. ECF No. 24-2, p. 9.

(1/29/11 – Clinic Notes) Reports Ibuprofin causing nausea. ECF No. 24-2, p. 11.

(3/10/11 – Clinic Notes) Issues r/t chronic pain. ECF No. 24-2, p. 14.

(5/2/11 – Clinic Notes) Chronic pain issues. ECF No. 24-2, p. 20.

(5/11/11 – CRC Report) She reports daily pain that she rates at 7-8/10. She reports increased pain with ambulation and currently uses a cane. She is currently taking Gabapentin and Ibuprofen with some relief. ECF No. 24-2, p. 22.

(6/27/11 – Clinic Notes) Has difficulty getting to toilet. Chronic pain – reports [increase] Gabapentin has been working well for her. ECF No. 24-2, p. 28

(6/29/11 – CRC Report) She continues to c/o diffuse pain, but in particular at R ankle/foot. She has daily pain that she rates 7 -8/10. Is on Gabapentin, Motrin with some relief. ECF No. 24-2, p. 31.

(8/8/11 – Clinic Notes) Reports has pain when uses cane … increased left knee pain especially since starting work. ECF No. 24-2, p. 35.

(9/12/11 – Clinic Notes) Patient … states that the pain, although present for 25 years, seems to have accelerated over the past couple of years…. [S]he is able to work as a janitor primarily because her boss lets her sit and rest on occasion when she needs to. She does not go to the gym and lift weights because this would simply be too painful. … [S]he does not do any programming because of pain that she is having and her mobility. [S]he is always last in line and can never get to the library in time to get in. She states that it is difficult for her to walk to meals and back but she is able to manage to do so. ECF No. 24-2, p. 39.

(9/21/11 – CRC Report) [C]omplaints of diffuse pain, especially to her right foot and ankle. She states she has daily pain that she rates at 7-8 or 10. She is currently taking Gabapentin and Motrin with some relief. ECF No. 24-2, p. 43.

REPORT AND RECOMMENDATION- 6

(3/22/12 – Clinic Notes) The patient states she is not wearing the prothesis anymore because it is too painful for her to wear.  ECF No. 24-2, p. 51.

Ms. McNearney also described her pain in various Health Services Kites:

"I am in severe pain."  (Kite dated 1/27/11).  ECF No. 23, at 28.

"My pain level is so high I am willing to try almost anything."  *Id.*, at 31 (Kite dated 4/22/11)  *Id.*, at 31.

"I spent all most [sic] the entire night screaming in pain.  It was worse than it has ever been."  (Kite dated 6/2/11)  *Id.*, at 30.

 "I am frustrated and humiliated.  My knees have gotten so bad I cannot bend far enough to sit on the toilet and have a very hard time getting back up."  (Kite dated 6/26/11)  *Id.*, at 29.

"I was in so much pain last night."  (Kite dated 10/11/11)  *Id.*, at 27.

ECF No. 23, (Supplemental Declaration of Hank Balson), Exh. 10, at 27-31.

After reviewing Dr. Colter's clinical note dated September 12, 2011, where Dr. Colter noted that Ms. McNearney "does have chronic pain which appears to be fairly well controlled at this time," (*see* ECF No. 24-2, at 40), Ms. McNearney sent the following Health Services Kite to Dr. Colter on September 25, 2011:

Dr. Colter, I had opportunity to review Clinic Notes Dictation done by yourself in Ref to our last appt. Dated 9/12/11.  1st I wish to thank you for such a thorough positive and hopeful dictation.  I can see that you took much time and consideration.  There are just a couple notations made which I would like to make clarification on, Pg. 1, ¶ 2 states that I am fairly reticent to have surgery.  Both my orthos on the outs and Dr. Friedman have considered the ankle fusion, but all have ultimately disregarded this as an option, clearly stating to me that while fusion is an option; it is permanent, but will wear out quickly so it is not a permanent solution.  My ortho Dr. Dahl had considered this surgery until a Bone Density scan was done and he then quickly disregarded the fusion as did my Dr. Dr. Starkweather.  2nd on pg 1 ¶ 3, I wish to clarify that I during my time out pursued aggressively medical treatment.  This was very difficult with no transportation to from appts and a very full schedule daily, I was unable to follow through any further due to incarceration.  3rd under the head note Medications, I have stated that the Ibuprofhen [sic] in comparison to Lodin, Aleve, etc. which I have tried

seems to work better for the swelling which is severely disabilitating [sic] as far as mobility, but for pain it does not touch the pain. Next, I wish to state that the Visteril I take perhaps 1x per week or less to help me sleep because the level of my pain does not allow me to do so, and the Cylexa I have discontinued as it seems to have no effect. And I do not like taking medication just to take it.

Under the Headnote of Assessment please allow me to make this clarification, I am desperate for help any type of surgical, physical therapy, I am willing to try almost anything, but it must make sense, and to do something such as fusion which has been highly disregarded as a solution by all others concerned does not make sense, it would just be doing something for the sake of saying something was done.

Under the Headnote Assessment: You made the dictation "That I do have chronic pain which appears to be fairly well controlled." For 26 years I have fought a battle between pain and insanity, pain. My pain has altered every positive aspect in my life. I have had to embrace this enemy and use it to strengthen myself, but it eventually has taken over. If you were to torture a man day after day year after year in the beginning he would most likely hear the suffering, but after the passing of time he would wear down, and finally beg for mercy.

I've known constant increasing pain for far too long. The quality of my life is layed [sic] low…. So to clarify the pain my pain is not under control it has taken control like a hammer on a solid stone day after day year after year eventually wearing away at the solidity of the stone.

ECF No. 23 (Balson Suppl. Decl.), at 39-43 (9/25/11).

According to Dr. Colter, Ms. McNearney has never mentioned pain which causes nausea, insomnia, or tearfulness to medical staff and she has always indicated that Ibuprofen and Gabapentin were adequately controlling her pain. ECF No. 24-1 (Colter Decl.), Exh. 2, ¶ 34. Ms. McNearney's prescription for Gabapentin was discontinued when she violated DOC rules by "cheeking" her Gabapentin instead of taking it as prescribed. *Id.*, ¶ 34. Ms. McNearney explains that when she was doing janitorial work in her living unit, she would occasionally "cheek" her Gabapentin pain medication. The medication was distributed in the early morning and in the evening. Because her afternoon work activity caused her increased pain, she would take one-half of her morning Gabapentin dose at the regular morning medline and save the other one-half for

REPORT AND RECOMMENDATION- 8

the afternoon to better manage her pain throughout the day. Ms. McNearney states that she was aware that this was against the rules, but she was desperate to do something about her pain so that she could work. She has not received Gabapentin since her provider discontinued the prescription last fall. ECF No. 22 (McNearney Decl.), ¶ 2.

In her Amended Complaint filed on April 2, 2012, Ms. McNearney alleged that her ankle condition has caused her "severe and chronic pain" and has interfered with her ability to ambulate. ECF No. 9, ¶ 15. She alleged that she has suffered "substantial pain in her left knee, which may be caused by her altered gait resulting from the problems with her right ankle." *Id*. She further alleged that she "has suffered intolerable pain due to her ongoing orthopedic problems" that has interfered with her sleep and caused symptoms of depression. *Id*. ¶ 18. On April 18, 2012, Defendants answered the amended complaint, conceding that they lacked sufficient knowledge or information to know whether or not the allegations were true. ECF No. 16 ¶¶ 15, 18.

C.     Care Review Committee – May 11, 2011

On May 11, 2011, Ms. McNearney's case was reviewed by an eighteen (18) member Care Review Committee (CRC). ECF No. 24-1 (Declaration of G. Steven Hammond, M.D.), Exh. 1, ¶ 9; ECF No. 24-1 (Colter Decl.), Exh. 2, ¶ 18, Attachment J.  Dr. Steven Hammond is the DOC's Chief Medical Officer. He is responsible for the overall quality, safety, and appropriateness of medical care provided to incarcerated offenders/patients in the DOC. Ms. McNearney has never met Dr. Hammond and he has not examined her. ECF No. 11, ¶ 12. Dr. Hammond chairs the DOC Medical Care Review Committee (CRC) and is a voting member of the CRC.

REPORT AND RECOMMENDATION- 9

The CRC is a group of medical providers constituted according to the DOC Offender Health Care Plan (OHP) to review the medical necessity of proposed health care within a cluster of DOC facilities. ECF No. 24-1 (Hammond Decl.), Exh. 1; ECF No. 24-1 (Colter Decl.), Exh. 2, Attachment A. In making its decisions, the members of the CRC rely on the OHP, which includes the DOC Levels of Care Directory. *Id.*, ¶ 4, Attach. A. There are three Levels of Care: Level 1, care that is medically necessary, which is authorized; Level 2, care that under certain circumstances as determined by CRC is medically necessary; and Level 3, care that is not medically necessary and not authorized. *Id.*, ¶ 5.

The primary determinants of medical necessity, according to the OHP, are whether the treatment is necessary to "save life or limb", or to treat intractable pain, or necessary to preserve the ability to perform activities of daily living (ADLs), or whether if intervention for these purposes is not necessary at the present, it is nevertheless necessary to intervene at the present to prevent such interventions in the future from being significantly more complicated or risky or less likely to succeed, if it is thought highly likely intervention would be required in the future, for the purpose of treating intractable pain or preserving the ability to perform ADLs. *Id.*

"Activities of Daily Living (ADLS)" are defined in the OHP as follows:

Activities of daily living are activities related to personal care and include bathing or showering, dressing, getting in or out of bed or a chair, using the toilet, eating, and walking or assisted mobility sufficient to accomplish these activities.

"Intractable pain" is defined in the OHP as follows:

Pain that is moderate to severe in intensity AND frequent or constant in occurrence AND physiologically plausible based on objective evidence from examination or tests AND unresponsive to conservative measures including, but not limited to: reasonable trials of various analgesics; discontinuation of potentially exacerbating activities such as sports and work; physical therapy when appropriate; a reasonable trial of watchful waiting when appropriate.

ECF No. 24-1, Attach. A, p. 34.

REPORT AND RECOMMENDATION- 10

The DOC may refer an inmate for outside medical consultations which may result in recommendations that are not medically necessary under the OHP. The OHP recognizes this and specifically considers "[c]onsultant recommendations (including instructions and orders), when not a Level 1 intervention" as Level 3 care. ECF No. 24-1 (Hammond Decl.), ¶ 6. When a consultant makes a recommendation, the recommendation may be referred to the CRC to decide whether implementation is medically necessary. If found not to be medically necessary pursuant to the OHP, the condition is categorized as Level 3 and the recommendation is denied. *Id.*

On May 11, 2011, the CRC was asked to approve an on-site orthopedic evaluation of Ms. McNearney's ankle/foot condition and have the orthopedist recommend nonsurgical interventions to assist in managing Ms. McNearney's pain and gait issues. *Id.* The CRC approved the proposed intervention as medically necessary as defined in the DOC's OHP. *Id.* ECF No. 24-1 (Colter Decl.), Exh. 2, ¶ 6, Attachment A.

## D. Dr. Mark Friedman's Examination

On June 3, 2011, Ms. McNearney was examined by Dr. Mark Friedman, a contract orthopedic surgeon for the DOC. ECF No. 24-1 (Colter Decl.) Exhibit 2, ¶ 20, Attachment K. Dr. Colter and Megan Herdener, ARNP gave Dr. Friedman the following Consultation Request/Report dated May 12, 2011:

> Please evaluate management of this challenging patient. She is a 46 yo patient who was in a MVA in 1986 and suffered several fractures and has had chronic pain since then, particularly in the R LE. She has been in and out of WCCW several times and will be here until 12/2012. On the outside, she had an ortho consult with Dr. Dahl in Wenatchee, see chart. She had been pursuing amputation on consideration of fusion at ankle. Please evaluate her recent Xrays for any new changes that should be more urgently addressed or if you have any suggestions on how to help manage/decrease her pain (a custom AFO?). Any feedback is much appreciated.

ECF No. 24-1 (Colter Decl.) Exh. 2, Attachment K.

REPORT AND RECOMMENDATION- 11

Following his examination of Ms. McNearney, Dr. Friedman stated:

3.    …[T]he solution is quite complicated and beyond the scope of my practice.
4.    *As far as a mechanical solution is concerned*, I agree that a fusion of the ankle and likely a correction of the flat foot deformity would be necessary as this was consistent with what she heard from an outside orthopedist.
5.    Given the severity of the deformities and arthrosis I think it would be reasonable for her to visit a foot and ankle specialist.
6.    She apparently has had some flat exposure to the University of Washington and Harborview Medical Center and I think that this would be a good place for her to go for a second opinion and possible long term treatment.
7.    She is well aware that this is not likely an entire cure for her pain but I feel fairly strongly that this would give her a stable platform on which to ambulate.
8.    *I strongly recommend* that she at least be considered for a second opinion at Harborview and would certainly defer to their judgment and treatment in this matter.

ECF No. 24-2 (Colter Decl.), Exh. 2, Attachment K (emphases added).

**E.    Care Review Committee – June 29, 2011**

On June 29, 2011, Ms. McNearney's medical condition was presented to the CRC with Dr. Friedman's recommendation for Ms. McNearney to consult with Harborview Orthopedics. The CRC was informed that Ms. McNearney "continues to complain of daily diffuse pain in her right ankle/foot, but she is able to complete her ADLs and appears to be functioning and moving around the facility." Her exam indicated that her right foot was inverted with decreased strength and range of motion causing an antalgic gait. CRC was informed that Dr. Friedman had determined that fusion of the foot along with corrections of the flat foot deformity would be helpful and had recommended that Ms. McNearney be considered for a second opinion at Harborview. The CRC determined the proposed intervention was not medically necessary at "this time." ECF No. 24-1 (Colter Decl.), Exh. 2, ¶ 22, Attachment M.

On September 6, 2011, Hank Balson, counsel for Ms. McNearney, sent an e-mail to Dr. Steve Hammond asking him to reconsider Dr. Friedman's recommendations and to arrange

REPORT AND RECOMMENDATION- 12

for Ms. McNearney to be evaluated by an appropriate specialist. ECF No. 13 (Balson Decl.), ¶ 8, Exh. 10. In response, Dr. Hammond acknowledged that since her accident, Ms. McNearney "has coped with an abnormal gait and pain related to the trauma to her lower extremities." *Id.* ¶ 9, Ex. 11. He further acknowledged that "she continues to experience pain and limitation of function, and she has developed pain in her left knee over the past couple of years." *Id.* He also wrote:

> Her situation is considered to be sufficiently complex that any surgical intervention at this point was considered to be beyond the scope of expertise of the general orthopedic surgeon who saw her at WCCW.

*Id.* Nevertheless, Dr. Hammond stated that further evaluation "did not meet DOC Offender Health Plan criteria as medically necessary at this time." *Id.* As noted above, Dr. Hammond has never met the Plaintiff and has not examined her. ECF No. 11 (McNearney Decl.), ¶ 12.

**F.     Dr. Starkweather's Opinion**

Dr. Starkweather, the orthopedic surgeon who examined Ms. McNearney shortly before she was incarcerated and who has since examined clinical notes of Drs. Colter and Friedman, notes that there is no evidence that Ms. McNearney's condition has changed since he examined her on May 28, 2010. He also notes that that her condition is degenerative and will not resolve without medical treatment. ECF No. 14 (Starkweather Decl.), ¶ 8. While he acknowledges that an orthotic device may provide Ms. McNearney with some support for her foot ankle, he is of the opinion that such a device is not a sufficient treatment measure in light of the severity of her case. He agrees with Dr. Friedman's recommendation that Ms. McNearney be referred to Harborview for further evaluation and a treatment plan. *Id.* ¶ 9. According to Dr. Starkweather, denying such further evaluation and treatment "violates the medical standard of care and leaves [Ms. McNearney] vulnerable to ongoing pain and further deterioration of her condition." *Id.* ¶

13.  He further cautions that "[t]he longer she is denied treatment, the more likely it is that later treatment will need to be more extensive and more expensive."  *Id.* ¶ 12.

**G.    Dr. Colter – September 12, 2011 Examination**

When Dr. Colter examined Ms. McNearney on September 12, 2011, she noted that Ms. McNearney has a "significant gait abnormality" and that Ms. McNearney has reported programming limitations due to her pain and immobility.  ECF No. 24-1 (Colter Decl.), ¶ 25, Attachment P.   Dr. Colter's assessment also included the following statements:

> Chronic right ankle pain after suffering a significant motor vehicle accident 25 years ago.

> I do believe that the patient's gait mechanics are so abnormal that they will likely cause hip and knee problems in the future.

*Id.*

Dr. Colter acknowledged that Dr. Friedman had recommended further orthopedic evaluation and treatment but that this recommendation was rejected as not meeting medical necessity under the OHP.  She also noted that a non-custom orthotic previously given to Ms. McNearney was unsuccessful because it was ill-fitting.  *Id.*  Dr. Colter suggested that DOC approve a custom ankle orthotic (brace) to give Ms. McNearney more support on her right side, stating, "I believe that progression of her lower extremity pain is likely without improvement to her gait, and support of the right ankle seems like a good starting point in order to accomplish that."  *Id.*

When Dr. Colter had referred Ms. McNearney to Dr. Friedman for an orthopedic consultation, Dr. Colter specifically asked Dr. Friedman to consider whether a custom ankle orthotic (AFO) might be a way to help manage or decrease the patient's pain.  *Id.* ¶ 5, Exh. 7.  Dr. Friedman did not recommend such an orthotic after he examined Ms. McNearney.  *Id.* ¶ 6,

REPORT AND RECOMMENDATION- 14

Exh. 8.)  Instead, he recommended that an ankle fusion and correction of her flat foot deformity would be necessary.  ECF No. 24-2 (Colter Decl.), Exh. 2, Attachment K (emphases added).

After reviewing Dr. Colter's clinical note, Ms. McNearney's counsel wrote to Dr. Hammond to correct a couple inaccuracies regarding Ms. McNearney's willingness to consider surgical treatment options and the extent of her ongoing pain, noting in particular that Ms. McNearney's pain was severe and that it woke her up and interfered with her ability to sleep.  ECF No. 13 (Balson Decl.). ¶10, Exh. 12.  Counsel again asked Dr. Hammond to approve Dr. Friedman's recommendation for a specialist evaluation, but Dr. Hammond provided no further response.  *Id.*  In her declaration, Ms. McNearney also disagrees with the suggestion in Dr. Colter's clinical note that Ms. McNearney was not anxious to pursue surgical options.  She explains that she thought her previous doctor had indicated that an ankle fusion might not be a permanent solution and she was not sure that this was the right treatment option.  She states that she is desperate to get relief from her pain and to stop her condition from getting worse.  She is willing to consider any and all treatment options that are recommended.  ECF No. 11 (McNearney Decl.), ¶ 11.

As noted above, Dr. Colter made the suggestion of a custom orthotic in September, 2011.  ECF No. 13 (Balson Decl.), ¶ 11, Exh. 8.  However, it was not until March, 2012, that DOC provided Ms. McNearney with a properly-fitting pair of shoes to accommodate the brace so that she could begin using it.  Although Ms. McNearney was hopeful the brace would provide some relief, she had to stop using it after approximately a week, as the pain it was causing became intolerable.  ECF No. 11 (McNearney Decl.), ¶ 10.

According to Dr. Colter, Ms. McNearney has sent over seventy kites concerning medications and treatment for her ankle/foot/knee issues.  Dr. Colter states that WCCW medical

REPORT AND RECOMMENDATION- 15

staff has responded to every issue raised in the kites. ECF No. 24-1 (Colter Decl.), Exh. 2, ¶ 32. For example, Ms. McNearney has received ice, insoles, a lower bunk, lower tier cell, shoes, socks, ankle brace, cane, and a pillow. *Id.*, ¶ 33. In addition, Dr. Colter states that Ms. McNearney has rarely complained of any pain that cannot be well controlled with Ibuprofen. *Id.*, ¶¶ 36-37.

However, Ms. McNearney disagrees with Dr. Colter's statement that her pain is "fairly well controlled" at this time. Although Ibuprofen and other pain relievers help to reduce her pain to a degree, she states that the pain she experiences is chronic and severe. *Id.* Currently, the only medication Mr. McNearney is receiving to help manage her constant pain is Ibuprofen. Before she was placed in segregation last October, she took 800 mgs three times a day. In segregation, Ibuprofen is given to her only twice per day. Recently the prescription expired and was not renewed despite her requests until after she contacted her attorney. ECF No. 22 (McNearney Suppl. Decl.), ¶ 4. When Dr. Colter renewed the prescription, she reduced the dose and now she receives only 600 mgs twice per day. This is one-half the amount she used to receive. She does not receive anything else for the pain, which continues to be severe. *Id.*, ¶ 4.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary and drastic remedy" that is never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 689-90, 128 S. Ct. 2207 (2008) (citations and quotation omitted). Instead, the instant motion requires the court to "balance the competing claims of injury and ... the effect of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24, 129 S. Ct. 365 (2008) (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542, 107 S. Ct. 1396 (1987)). A plaintiff seeking a preliminary injunction must establish the following: (1) a likelihood of success on the merits, (2) a likelihood

REPORT AND RECOMMENDATION- 16

of irreparable injury to the plaintiff if injunctive relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest. *Id.* (citations omitted).

The Prison Litigation Reform Act (PLRA) imposes certain guidelines on the prospective relief to be granted to an inmate litigant challenging prison conditions:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (i)(B) in tailoring any preliminary relief.

18 U.S.C. § 3626(a)(2). "Section 3626(a) therefore operates simultaneously to restrict the equity jurisdiction of federal courts and to protect the bargaining power of prison administrators - no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum." *Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

## DISCUSSION

**A.      Likelihood of Success on the Merits**

This motion is based on the Eighth Amendment claims in the complaint alleging that the inadequacy of the medical treatment received by Ms. McNearney is tantamount to cruel and unusual punishment.  A prisoner can establish an Eighth Amendment violation arising from deficient medical care if she can prove that prison officials were deliberately indifferent to a serious medical need.  *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976).  A finding of deliberate indifference involves the examination of two elements:  (1) the seriousness of the prisoner's medical need and (2) the nature of the defendant's responses to that need.  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller,* 104 F.3d 1133 (1997).  A "serious" medical need exists if the

REPORT AND RECOMMENDATION- 17

failure to treat a prisoner's condition could lead to further injury or the "unnecessary and wanton infliction of pain." *Id.* (citing Estelle, 429 U.S. at 104). Examples of conditions that are "serious" in nature include an injury that a reasonable doctor or patient would find important and worthy of comment or treatment, a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain. *McGuckin*, 974 F.2d at 1060; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000).

If the medical needs are serious, the plaintiff must show that the defendants acted with deliberate indifference to those needs. *Estelle*, 429 U.S. at 104. The plaintiff must demonstrate that the prison medical staff knew of and disregarded an excessive risk to her health. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay, or intentionally interfere with medical treatment'" or the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir.1992) (*overruled on other grounds*); *Hunt v. Dental Dept.*, 865 F.2d 198, 201 (9th Cir .1989) (citations omitted). In making such a showing, the plaintiff should allege a purposeful act or omission by the defendant. *McGuckin*, 974 F.2d at 1060.

### 1.     Serious Medical Need

Defendants do not dispute that Ms. McNearney has a serious medical need. In addition, the record reflects that Ms. McNearney's medical needs are serious. DOC's own orthopedic specialist, Dr. Mark Friedman, stated that her condition was "quite complicated" and "beyond the scope of his practice." Dr. Friedman strongly recommended DOC send the Plaintiff for a second opinion to Harborview Medical Center, noting that he would defer to their judgment and treatment. ECF No. 24-2, at 25-26.

REPORT AND RECOMMENDATION- 18

Dr. Starkweather, who examined Ms. McNearney on May 28, 2010 and who reviewed Dr. Friedman's clinical note of June 3, 2011, states that Ms. McNearney is suffering from a painful, degenerative orthopedic condition that will not resolve without medical treatment. He agrees with Dr. Friedman's conclusion that the solution to Ms. McNearney's condition is "quite complicated" and that she should be evaluated by a foot and ankle specialist. Dr. Starkweather also reviewed Dr. Colter's clinical note of September 12, 2011 and saw nothing to indicate that Ms. McNearney's condition has improved since he last saw her in May of 2010. ECF No. 14 (Starkweather Decl.)

Moreover, Ms. McNearney has established through her own testimony that she suffers from chronic pain and mobility issues. ECF No. 11 and 22. Her medical records confirm that she suffers from a chronic medical condition worthy of comment or treatment. *See, e.g.,* ECF No. 24-1 (Colter Decl.), Exh. 2, Attachments B – U.

A reasonable jury could find that Ms. McNearney's medical needs were objectively serious enough to satisfy the first element of an Eighth Amendment claim.

**2.      Deliberate Indifference**

Defendants argue that they were not deliberately indifferent to Ms. McNearney's needs because she has received constant treatment at WCCW, her pain is well-controlled, they do not have to follow the recommendation of their consultant, and if her condition deteriorates, they can always bring her case back before the CRC for further consideration. ECF No. 20, at 9.

To prevail on an Eighth Amendment claim, the plaintiff need not prove a "complete failure to treat." *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989); *Lopez,* 203 F.3d at 1132. Failure to render competent care may also violate the Eighth Amendment. *Hoptowitt v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982). In *Hoptowit*, the Court explained:

REPORT AND RECOMMENDATION- 19

Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems. The medical staff must be competent to examine prisoners and diagnose illnesses. It must be able to treat medical problems or to refer prisoners to others who can. Such referrals may be to other physician within the prison, or to physicians or facilities outside the prison.

*Id.* at 1253. Differences in judgment between medical providers regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir. 1989). "To prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi v. Chung,* 391 F.3d 1051, 1058 (9th Cir. 2004).

Defendants do not dispute that Ms. McNearney has a complicated, painful, degenerative orthopedic condition. They acknowledge that the orthopedic specialists who have examined her, including the one retained by DOC, have proposed surgery and recommended further evaluation and treatment by a foot and ankle specialist. However, they have refused to authorize such an evaluation and treatment because they deem it "not medically necessary" under the OHP. ECF No. 24-1 (Hammond Decl.), Exh. 1, ¶ 5. Dr. Hammond, who has never examined Ms. McNearney opines that her condition "does not appear to cause her 'intractable pain'". *Id.*, ¶ 9. Defendants argue that they have not ignored or disregarded medically necessary care for Ms. McNearney's condition, but have instead chosen to treat her conservatively and that such a conservative approach under the circumstances is not unreasonable. However, there is no medical opinion from any *orthopedic* specialist who has examined Ms. McNearney to support that conclusion.

REPORT AND RECOMMENDATION- 20

The issue is whether the decision to not authorize the requested referral was "medically unacceptable" and not whether Ms. McNearney suffers "intractable pain" as that term is defined in the OHP (*i.e.,* pain that is severe in intensity and frequent or constant in occurrence and based on objective evidence and unresponsive to conservative measures), although the record is replete with references to severe and frequent pain caused by Ms. McNearney's objectively confirmed medical condition. *See* ECF No. 24-1 (Colter Decl), Exh. 2, at 6, 9, 11, 14, 20, 22, 28, 31-, 35, 39, 43, 51 (25 year history of chronic lower extremity pain (12/16/10); reports daily 8-9/10 pain and limited mobility on high doses of Ibuprofen and Neurontin (12/29/10); Issues r/t chronic pain (3/10/11); reports daily pain that she rates at 7-8/10, increased pain with ambulation, currently uses can and taking Gabapentin and Ibuprofen with some relief (5/11/11); difficulty getting to toilet, reports increase in chronic pain, Gabapentin has been working well for her (6/27/11); has daily pain that she rates 7 -8/10, is on Gabapentin, Motrin with some relief (6/29/11); pain has accelerated over past couple of years (9/12/11); reports daily pain of 7-8 or 10, taking Gabapentin and Motrin with some relief (9/21/11); not wearing prosthesis because it is too painful to wear (3/22/11)).

Presently, Ms. McNearney states that her pain level varies and her condition has not improved since she arrived at WCCW in October 2010. She states that she has been in almost constant pain. On a good day, she describes her pain as a 6 or 7 on a pain scale of 1 to 10. On a bad day it is a 10 or higher. She attempts to manage the pain with ibuprofen and other non-narcotic pain relievers when they are available to her, but the pain is always present on some level. When the pain is at its worst, the pain keeps her from sleeping, makes her nauseated, and brings her to tears. ECF No. 11 (McNearney Decl.), ¶ 6.

The foregoing facts are contrary to the Defendants' conclusion that Ms. McNearney's pain is being well managed. Moreover, the issue here is whether Defendants' approach of conservative treatment to include Ibuprofen and the use of the AFO for Ms. McNearney's chronic pain is medically unacceptable in light of evidence that such treatment may be insufficient to meet Ms. McNearney's medical needs. Dr. Friedman, the orthopedic specialist hired by the DOC to evaluate Ms. McNearney's medical needs, is of the opinion that fusion of her ankle and likely a correction of her flat foot deformity is necessary. He *strongly recommended* that she at least be considered for a second opinion at Harborview and stated that he would certainly defer to their judgment and treatment. ECF No. 24-2, at 25-26. Dr. Starkweather, another orthopedic surgeon, agrees with this conclusion. He saw Ms. McNearney in May 2010 and at that time noted that she was suffering from a degenerative orthopedic condition that would not resolve without medical treatment. ECF No. 14 (Starkweather Decl.), ¶ 9. Although Dr. Starkweather has not seen Ms. McNearney since May 2010, he has examined Dr. Friedman's clinical note dated June 3, 2011 and Dr. Colter's clinical note dated September 12, 2011. He saw nothing in those notes to conclude that Ms. McNearney's condition had improved since he saw her or that her condition no longer requires treatment. *Id.*, ¶¶ 9-10. Defendants provide no evidence to the contrary.

Dr. Starkweather is of the opinion that denying further evaluation and treatment violates the medical standard of care and leaves Ms. McNearney vulnerable to ongoing pain and further deterioration of her condition. ECF No. 14 (Starkweather Decl.), ¶¶ 9-10, 13. He is further of the opinion that use of a custom orthotic, especially a brace, does not reasonably address Ms. McNearney's treatment needs. *Id.*, ¶ 11.

REPORT AND RECOMMENDATION- 22

Reliance on the OHP and its definitions alone does not always align with the appropriate medical standard of care. The Eighth Amendment is not limited by the OHP. It does not require Plaintiff to prove that she is in "intractable pain," as that term is defined by DOC's Offender Health Plan, or that the pain she is suffering "dominates [her] existence and precludes her from normal activities." Whether prison officials are complying with their own internal policies is a separate question from whether or not they are complying with the Constitution. See, e.g., *King v. Hubbard*, No. 1:09-cv-00016, 2009 WL 4052721, at *4 (E.D. Cal. Nov. 19, 2009) ("A determination as to whether Defendant . . . acted in violation of the Eighth Amendment does not turn on whether he acted in compliance with [prison] policies and procedures.").

It is noteworthy that Defendants initially found it to be a "medical necessity" to have Ms. McNearney's medical condition evaluated by an orthopedic surgeon, but now claim that it is not a "medical necessity" to follow his strong recommendation that she *at least* be considered for a second opinion. By offering only Ibuprofen for pain management, a brace that has been shown to be ineffective and painful, and "monitoring," Defendants have chosen a course of treatment that is medically unacceptable under the circumstances, and have done so in conscious disregard of an excessive risk to Plaintiff's health. *See, e.g., Hamilton v. Endell,* 981 F.2d 1062 (9th Cir. 1992)(overruled in part on other grounds); *Snow v. McDaniel,* --- F.3d ---, 2012 WL 1889774 (9th Cir. 2012) (it was unreasonable for defendants to rely on their own non-specialized medical conclusions to continue an indefinite course of steroids and NSAIDS when orthopedic surgeons hired to consult on the case had recommended surgery).

Accordingly, Plaintiff has shown a likelihood of success on the merits of her Eighth Amendment claim.

**B.      Likelihood of Irreparable Injury**

The second factor for the Court to consider is the likelihood of irreparable injury if Ms.

McNearney is denied the medical treatment she is currently seeking, *i.e.*, an evaluation by the

foot and ankle specialists at Harborview Medical Center and treatment recommended by those

specialists.

Ms. McNearney argues that there is no evidence and no reason to believe that her

condition will improve or that her pain will subside without treatment.  ECF No. 10, at 16.  In

addition, Dr. Starkweather has testified that her condition is degenerative and that if she is denied

further evaluation and treatment, she will remain "vulnerable to ongoing pain and further

deterioration of her condition."  ECF No. 14 (Starkweather Decl.), ¶ ¶  12-13.

Defendants argue that Ms. McNearney's medical condition is not new, went untreated for

years prior to her incarceration, there is no evidence that her condition has worsened, and that her

pain can be managed through pain medications, physical therapy, and use of her AFO.  ECF No.

20, 11.  The evidence reflects that currently, the only treatment Defendants are providing for Ms.

McNearney's condition is the orthotic device that she does not use due to the pain it causes her

and 600 mgs. of Ibuprofen twice a day, which is one-half the amount of medication she used to

receive.  ECF No. 22 (McNearney Suppl. Decl.)

The Court has already concluded that Ms. McNearney has shown a likelihood of success

on the merits of her Eighth Amendment claim.  Thus, she need only establish the possibility of

irreparable harm.  Ms. McNearney has met this burden.  There is ample evidence, from Ms.

McNearney's medical records, kites and declarations, that she continues to suffer unnecessary

pain despite the current use of Ibuprofen and the custom-fitted AFO, which caused her further

pain.  There is evidence from the DOC orthopedic specialist, who agreed with orthopedic

REPORT AND RECOMMENDATION- 24

specialists who had previously examined Ms. McNearney, that a "fusion of the ankle and likely a correction of the flat foot deformity would be necessary." ECF No. 24-2, at 25-26. Another orthopedic specialist opines that the lack of treatment leaves Ms. McNearney "vulnerable to ongoing pain and further deterioration of her condition." Dr. Colter noted that Ms. McNearney's "gait mechanics are so abnormal that they will likely cause hip and knee problems in the future." ECF No. 24-1 (Colter Decl.), ¶ 25.

The undersigned concludes that Defendants' refusal to follow the course of treatment recommended to them by their own physician rises to a constitutionally cognizable level amounting to the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104. Therefore, there is a showing of irreparable injury from withholding further evaluation and treatment recommendation until the conclusion of this lawsuit, assuming Ms. McNearney were to prevail.

## C.    Balance of Equities

In considering the equities of a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," and should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. at 24 (internal quotation marks and citation omitted). Ms. McNearney argues that the only harm Defendants face from the imposition of a preliminary injunction is the expense and administrative burden of transporting Ms. McNearney to Harborview Medical Center for the evaluation recommended by Dr. Friedman and authorizing whatever treatment is recommended. ECF No. 10, at 16. Dr. Starkweather, who saw Ms. McNearney in 2010, believes that the longer Ms. McNearney is denied treatment, the more likely

REPORT AND RECOMMENDATION- 25

it is that later treatment will be more extensive and expensive.  ECF No. 14 (Starkweather Decl.), ¶ 12.

When adjudicating a preliminary injunction motion, the Ninth Circuit expects lower courts to protect physical harm to an individual over monetary costs to government entities. See *Harris v. Board of Supervisors, Los Angeles County*, 366 F.3d 754, 766 (9th Cir. 2004) ("[f]aced with [ ] a conflict between financial concerns and preventable human suffering, [the court has] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor.") (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir.1983)); and *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir.2004) (affirming preliminary injunction in favor of disabled plaintiffs challenging the county's decision to close specialty medical facility; balance of hardships tipped in favor of plaintiffs, who would be deprived of necessary treatment and suffer increased pain and medical complications).

Defendants argue that Plaintiff's request is premature in that it circumvents their ability to defend themselves against the allegations of her complaint and that granting temporary relief would insert this Court as "decision-maker for her medical care."  ECF No. 20, at 11.  This argument is without merit.  First, Defendants have offered no legal authority to support this argument.  Second, evaluation of Ms. Ms. McNearney's condition, suffering, and need for further treatment was done within the inmate medical treatment process of the Offender Health Plan.  The physician who examined Ms. McNearney was engaged by the DOC specifically to evaluate her condition.  In light of his findings and the findings of at least one other orthopedic specialist that Ms. McNearney is suffering and will continue to suffer unnecessary pain, the undersigned finds that the balance of hardships is greater for Ms. McNearney if the injunction were not granted.

REPORT AND RECOMMENDATION- 26

**D.    Public Interest**

"[T]here is the highest public interest in due observance of all constitutional guarantees . . . ."  *United States v. Raines*, 362 U.S. 17, 27, 80 S.Ct. 519 (1960); accord *Legal Aid Soc'y of Hawaii v. Legal Services Corp.*, 961 F. Supp. 1402, 1409 (D. Haw. 1997) ("[P]erhaps no greater public interest exists than protecting a citizen's rights under the constitution.").  In addition, "[t]he public has a strong interest in the provision of constitutionally-adequate health care to prisoners."  *Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009).  *See also Farnham v. Walker*, 593 F. Supp. 2d 1000, 1017 (C.D. Ill. 2009) (holding that public had an interest in the maintenance of prisoner's health during the pendency of the lawsuit); *Duran v. Anaya*, 642 F. Supp. 510, 527 (D.N.M. 1986) ("The public at large is not served by . . . the willful or wanton infliction of pain and suffering on prisoners . . . .").

There is no public interest in forcing Ms. McNearney to continue suffering unnecessary pain during the pendency of this litigation.  The public interest favors a preliminary injunction requiring that Defendants comply with the Eighth Amendment by providing further evaluation and treatment.

Pursuant to the PLRA, the Court must also give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the preliminary relief.  18 U.S.C. § 3626(a)(2).   There is no evidence in this case that either public safety or operation of the criminal justice system is impacted.

Because Ms. McNearney has met all of the factors for injunctive relief, the undersigned recommends that her motion should be granted.

**CONCLUSION**

For the foregoing reasons, the undersigned recommends that the Court grant Plaintiff's motion for preliminary injunction. ECF No. 10. The Court should order that:

       1)     Defendants arrange for Plaintiff to be examined by specialists at the foot and ankle clinic at the Harborview Medical Center, to evaluate and make a treatment recommendation.

       2)     The examination should take place as soon as Harborview's schedule permits.

       3)     Defendants shall provide Plaintiff's counsel with a copy of the consultation report and treatment recommendation within two days after receipt.

       4)     If Defendants dispute the necessity of the treatment recommended by the specialists at Harborview Medical Center, they may move this Court to modify this Order by filing a motion no later than twenty-one (21) days after receiving the recommendation.

       5)     If Defendants do not oppose the recommended treatment, they shall authorize, perform, and/or facilitate any treatment recommended by the specialists at Harborview Medical Center.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **July 2, 2012**, as noted in the caption.

**DATED** this <u>15th</u> day of June, 2012.

*Karen L. Strombom*

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION- 28